OKLAHOMA STATE BANK *v.* BANK OF CENTRAL ARKANSAS.

Opinion delivered October 18, 1915.

1. FRAUD AND DECEIT—MONEY—RIGHTS OF INNOCENT PARTY.—Money which has been misappropriated or which has been obtained by fraud and afterwards paid to an innocent party, cannot be recovered.

2. FRAUD AND DECEIT—PAYMENT OF MONEY—RIGHTS OF INNOCENT PARTY.—Money cannot be recovered from one who in good faith took it, in the due course of business.

3. BILLS AND NOTES—DRAFT—FRAUDULENT TRANSACTION—COLLECTING BANK—OWNERSHIP OF FUNDS.—M drew a draft on K in favor of W. W indorsed the draft, placed it with the C Bank for collection. The transaction was fraudulent, W acting as the agent of M. The draft was collected and the proceeds placed to the credit of M. *Held,* the C Bank became the agent of M for the collection of the draft, and when it received the money it received it as M's agent.

4. BANKS AND BANKING—CUSTOMER'S FUNDS—APPROPRIATION ACCORDING TO HIS ORDER—FRAUDULENT TRANSACTION—OWNERSHIP OF FUNDS.—The proceeds of a draft were deposited in the C Bank to the credit of one M. The transaction by which the drawee of the draft was induced to pay the same, was fraudulent, the bank, being notified of that fact, and that the funds belonged to the said drawee, is without authority to appropriate the same, according to any instructions received from M.

5. BANKS AND BANKING—CUSTOMER'S FUNDS—OWNERSHIP—APPROPRIATION ACCORDING TO DIRECTION—CONTROL BY BANK.—Where a bank holds funds, the proceeds of a certain draft, which it had credited to one M and supposed belonged to him, and according to instructions from M, attempted to credit the same on a certain note against M, which it held for collection, when the bank learned that the

money was the proceeds of a fraudulent transaction, and properly belonged to one K, it has the right to withdraw the attempted appropriation, and hold the funds, and upon a proper showing K is entitled to a recovery of the funds paid by him as a result of this fraud.

Appeal from Lonoke Chancery Court; *John E. Martineau,* Chancellor; affirmed.

*Geo. M. Chapline* and *John W. Newman,* for appellant.

1. Money which has been misappropriated to an innocent third party can not be recovered by the one from whom the funds were misappropriated. 180 U. S. 284. 1 Burr. 452; 25 L. R. A. (N. S.) 631. The money here was applied to the note before the garnishment. 67 Ark. 223-227; 56 *Id.* 473, 482; 103 N. E. 780.

*W. A. Leach,* for appellees.

1. The decree is right on the whole case and should be affirmed. When the garnishment was served, the money was to the credit of Muse at the bank. It was obtained by fraud and had never been credited on the note. 67 Iowa, 11; 31 Minn. 230; 34 L. R. A. (N. S.) 734; 55 So. 47; 86 Ark. 140.

McCULLOCH, C. J. This action was instituted in the circuit court of Lonoke County, and after the issues were joined in the pleadings, the case was by agreement of parties transferred to the chancery court of that county and proceeded there to a final decree. The plaintiff, C. M. Keys Commission Company, a corporation doing business at East St. Louis, Illinois, claims an indebtedness against defendant, T. J. Muse, in the sum of $1,166.30, of which the sum of $1,150 was incurred by a draft drawn by Muse on said plaintiff in favor of one Ben Wildman, which said draft was deposited by Wildman for collection with the garnishee, Bank of Central Arkansas, at Lonoke, and paid by the plaintiff to said garnishee. R. F. Johnson and Oklahoma State Bank, a banking institution of Ada, Oklahoma, were both joined as defendants and a writ of gar-

nishment was issued and served on the Bank of Central Arkansas. It was alleged in the complaint that the defendant Muse fraudulently represented to the plaintiff that said draft was drawn for the price of cattle purchased and shipped to plaintiff, and that the draft was drawn for the purpose of obtaining funds to pay a note of Muse to Johnson, which had been sent for collection by the Oklahoma State Bank to the Bank of Central Arkansas. It is further alleged that Johnson was the owner of the note and that he was aware of the design of Muse to obtain money from the plaintiff on false representations concerning the purchase of cattle in order to secure the payment of the draft for use in applying on the note. Defendant, Oklahoma State Bank, filed an answer and cross-complaint, claiming to be the owner of the note referred to in the complaint by assignment from Johnson, and alleging that said sum of $1,150, together with the additional sum of $220, also received by the Bank of Central Arkansas from Muse, had been applied on the note, and prayed for judgment against the Bank of Central Arkansas for the amount so applied on the note, but which had not in fact been remitted to said Oklahoma State Bank.

. The facts of the case as developed in the testimony are as follows: The plaintiff was engaged in the cattle commission business at East St. Louis, and defendant Muse, who was operating as a cattle buyer in Oklahoma and Arkansas, opened up an account with the commission company for advances of money in payment of the drafts drawn on shipments of cattle which were to be sold on the market by the commission company for Muse. On September 23, 1913, Muse drew a draft on the plaintiff in favor of Ben Wildman for $1,150, and deposited the same for collection with the Bank of Central Arkansas. The amount of this draft was passed to the credit of Muse on that day by the Bank of Central Arkansas and the draft was forwarded for collection and promptly paid by plaintiff on presentation. Muse executed his negotiable promissory note to defendant, R. F. Johnson, for the sum of $1,550, dated June 26, 1913, payable October 1 after

date.   Johnson assigned the note before maturity to the Oklahoma State Bank, and on September 4, 1913, Oklahoma State Bank forwarded the note to the Bank of Central Arkansas for collection.   This was done at the suggestion or upon the direction of Muse.   The note was sent in the regular course of business with the usual instructions concerning the collection and return of the funds. Wildman testified that when he deposited the draft with the Bank of Central Arkansas for collection, he instructed the cashier to credit the same upon the note, but that statement is disputed by the cashier, who in his testimony says that the instructions were merely to credit the amount to Muse, which he did, and furnished Wildman a deposit slip showing such a credit to the account of Muse. On October 3 the cashier of the Oklahoma State Bank addressed a communication to the Bank of Central Arkansas concerning the Muse note which had been sent for collection, and inquired what amounts if any had been paid on the note and what was thought of the prospect for an early collection.   The cashier of the Bank of Central Arkansas answered, stating that a draft on St. Louis for $1,150 had been sent for collection and that the cashier thought that "everything will be all right this week."   It appears from the testimony that at that time the Bank of Central Arkansas had received a report of the payment of the St. Louis draft and that the money was then standing on the books of the bank to the credit of Muse.

Plaintiff sent one of its agents to Arkansas to look into the affairs of Muse, and said agent visited Des Arc, where Muse had been buying cattle, and also went to Lonoke on October 19 and called to see the cashier of the Bank of Central Arkansas and informed him of the condition of Muse's account with plaintiff and that Muse's conduct in the transaction was wrongful.   This agent also informed the cashier of the Bank of Central Arkansas that a suit against Muse would be instituted, and asked that the deposit to Muse's credit be not disturbed until after the papers could be gotten out for a suit.   Wildman called up the Bank of Central Arkansas from Des Arc

on October 20 and gave instructions to apply the amount of the $1,150 collection on the Muse note. This was done by Wildman upon instructions of Muse. Wildman testified that Muse instructed him to do so, and that statement is not controverted. The cashier made reply to Wildman that it would be done. The statement of the cashier was that he replied "all right." The cashier thereupon made a pencil indorsement on the back of the note, as follows: "Paid $1,150, 10-20-13." The cashier also made out a charge slip directing the sum of $1,150 to be charged to Muse on his account. He placed the charge slip on the hook and the bookkeeper subsequently entered it up on Muse's account, charging him with $1,150. On the night of October 20, the cashier consulted the attorney of the bank, who told him that in view of the prospect of a suit he had better not remit the proceeds to the Oklahoma State Bank but should hold the same for further development. This suit was instituted on October 21, 1913, and the writ of garnishment was served on the Bank of Central Arkansas on that date. The next day (October 22), the cashier erased the pencil indorsement on the note and caused the bookkeeper to credit the sum of $1,150 back to Muse, and the account stands in that shape to this date. There was also a credit of $220 to Muse's account, in addition to $1,150, and the chancellor rendered a decree in favor of the Oklahoma State Bank for said amount of $220, and that sum has thus been eliminated from the controversy. The chancellor decided that at the time the garnishment was served, the funds standing to the credit of Muse had not been applied on the note owned by the Oklahoma State Bank and were therefore subject to the plaintiff's garnishment.

The evidence establishes beyond controversy the fact that Muse induced the plaintiff by false representations to pay the draft which he had drawn in favor of Wildman, and the evidence is also convincing that Wildman, who acted as agent of Muse, participated in the fraudulent scheme to secure the money from plaintiff. There is, however, no testimony tending to show that the defendant,

Oklahoma State Bank, participated in this fraud or that it was not an innocent purchaser of the Muse note for value before maturity. There is nothing in the record that would warrant a finding against the good faith of the Oklahoma State Bank in the transaction.

(1-2) It is, as contended by counsel for appellant, well settled by the authorities that money which has been misappropriated, or which has been obtained by fraud and afterward paid to an innocent party, can not be recovered. *Holly* v. *Missionary Society*, 180 U. S. 284. This results from the well established rule that money can not be recovered from one who in good faith took it in the due course of business. The reason on which the rule is founded is stated by the New York Court of Appeals in the case of *Hatch* v. *National Bank*, 147 N. Y. 184, as follows: "This doctrine goes upon the ground that money has no earmark, that in general it can not be identified as chattels may be, and that to permit in every case of the payment of a debt an inquiry as to the source from which the debtor derived the money and a recovery if shown to have been dishonestly acquired, would disorganize all business operations, and entail an amount of risk and uncertainty which no enterprise could bear. The rule is founded upon a sound general policy as well as upon that principle of justice which determines, as between innocent parties, upon whom the loss should fall under the existing circumstances."

(3) But if we give full force to those well-settled principles, their operation does not prevent plaintiff from recovering the funds which it was induced by fraud to pay out. It is shown by the evidence that Wildman was the agent of Muse in the transaction and participated in the latter's fraudulent scheme to draw a draft and induce the plaintiff to part with its funds in payment thereof. Wildman indorsed the draft and turned it over to the Bank of Central Arkansas, and that bank, according to the testimony of the cashier, received the draft for collection and credit to the account of Muse. In other words, the Bank of Central Arkansas became the agent of Muse for the

collection of the draft, and when it received the money it received it as Muse's agent. The case is really no stronger if we accept Wildman's statement that he delivered the draft to the Bank of Central Arkansas for collection and credit on the note, for even in that event the Bank of Central Arkansas was the agent of Muse for the purpose of collection, and it remained the funds of Muse until it was actually appropriated in the manner directed. Now, the Bank of Central Arkansas, as before stated, when it received the funds from plaintiff, received them as the funds of Muse; and if plaintiff is entitled to recover the funds from Muse, on account of the payment having been wrongfully procured by fraudulent misrepresentations, it can also recover from the Bank of Central Arkansas as Muse's agent. The fact that the bank placed the funds to Muse's credit, even though it thereby constituted itself the debtor of Muse to that extent, did not change the character of the transaction so as to prevent the plaintiff from recovering the funds as long as the same were held by the bank. As soon as the plaintiff gave notice to the bank that the payment of the draft had been wrongfully obtained, it was the duty of the bank to hold the funds as those of the plaintiff, and there was a right of action as for money had and received against the bank from that moment. *Arkansas National Bank* v. *Martin,* 110 Ark. 578.

The proof in this case is that the day before the cashier of the Bank of Central Arkansas attempted to appropriate the funds to the note held by the Oklahoma State Bank, plaintiff's agent gave notice to the cashier of the Bank of Central Arkansas of Muse's wrongful conduct which procured the payment of the draft. According to the testimony of the cashier, there was enough said to him by the plaintiff's agent to put him upon notice that the funds had been wrongfully procured, and under those circumstances the bank had no right to pay the funds out to another party. *Arkansas National Bank* v. *Martin, supra; Carroll Co. Bank* v. *Rhodes,* 69 Ark. 43. In other words, under the proof which establishes beyond dispute

that the payment of the funds was induced by fraud, the funds remained in fact the property of the plaintiff as the true owner, and from the time that the Bank of Central Arkansas received information concerning the truth of . the transaction, it knowingly held money which belonged to the plaintiff and not to Muse. The testimony of the cashier is that he made a pencil memorandum on the note showing the payment of the sum of $1,150, and he charged that sum on Muse's account. He states that the reason he made the indorsement in pencil was that he did not regard it as final until he was ready to make a remittance of the money and cancel the note. If the funds had in fact been the property of Muse, those acts of the cashier would have constituted an appropriation of the funds to the payment of the note, for the funds stood to the credit of Muse on the books of the bank, and Muse, through his agent, gave directions to make the appropriation in that way. *Daniel* v. *St. Louis National Bank,* 67 Ark. 223; *Nineteenth Ward Bank* v. *First National Bank of South Weymouth,* 184 Mass. 49; *First National Bank of Birmingham* v. *Gibert,* 123 Ala. 846, 25 L. R. A. (N. S.) 631; Note to *Virginia-Carolina Chemical Co.* v. *Steen,* 34 L. R. A. (N. S.) 734; 2 Michie on Banks and Banking, p. 1414; *Howard* v. *Walker,* 92 Tenn. 452.

(4-5)  But an altogether different question is presented when we consider the transaction in the light of the fact that the funds did not really belong to Muse and ought not to have been appropriated to the payment of the note, for the cashier of the bank had received notice at that time that the funds were the property of the plaintiff, and therefore he had the right at any time before the note was cancelled and the funds remitted to the Oklahoma State Bank to withdraw the erroneous appropriation, which he did, and thereafter held the funds for the plaintiff as the rightful owner. The case stands the same as if the cashier had attempted to appropriate funds of any other individual to the payment of the note and had gone far enough to make the pencil indorsement on the note but had decided not to do so and refrained from for-

warding the funds. Certainly the bank would not under those circumstances be held to the appropriation of the funds of another person to the payment of this note; and, as we have seen that these funds did in fact belong to the plaintiff and not to Muse, the right of the cashier to withdraw the attempted appropriation for the payment of the note still existed.

The Bank of Central Arkansas was first brought into the case as garnishee, but it was made a defendant to the cross-complaint and the cause was by consent transferred to equity, and the bank, as well as all other parties, was treated as a proper party to the action. We overlook, therefore, the form in which the liability of the bank was originally raised and look to the substance of the controversy as shown by the proof. Our conclusion is that upon those facts the plaintiff was entitled to recover the funds, and that defendant, Oklahoma State Bank, is not entitled to the funds which had been wrongfully secured from the plaintiff by Muse's fraudulent conduct.

The decree is therefore affirmed.